Filed 8/1/23  In re A.J. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re A.J., a Person Coming Under the Juvenile Court Law. | B321480 (Los Angeles County Super. Ct. No. 21CCJP04085) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. A.C., Defendant and Appellant. | |

APPEAL from the jurisdictional and dispositional orders of the Superior Court of Los Angeles County, Terry T. Truong, Judge Pro Tempore.  Affirmed.

Benjamin Ekenes, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel and William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

This dependency case commenced after father tried forcibly to remove his infant son, A.J., from mother's care. The juvenile court assumed jurisdiction over A.J. based on multiple allegations, including the undisputed allegation that A.J. suffered broken ribs because of inflicted trauma. The Los Angeles County Department of Children and Family Services (DCFS) placed A.J. in the custody of an extended family member and later in foster care. Ultimately, the juvenile court terminated its jurisdiction and awarded mother full physical custody and both parents joint legal custody.

On appeal father challenges the juvenile court's jurisdictional and dispositional orders. Father's argument that the juvenile court incorrectly referred to him as the biological rather than presumed father at the dispositional hearing is moot because the juvenile court has since recognized that father is A.J.'s presumed father. Father's argument that one of many grounds for jurisdiction was not supported by substantial evidence also is moot because even if no substantial evidence supported that challenged ground, the juvenile court properly assumed jurisdiction over A.J. Father's argument that pursuant to Welfare and Institutions Code[1] section 224.2, social workers were required to interview his and mother's extended family

_____

[1] Undesignated statutory citations are to the Welfare and Institutions Code.

2

members about A.J.'s potential Indian status also is moot because A.J. has been returned to mother's custody.

Although father submitted on DCFS's recommendation that A.J. be placed outside of mother and father's custody, on appeal he argues the juvenile court failed to consider reasonable alternatives prior to removing A.J. from his custody. Assuming this issue was properly preserved, father's argument has no merit because assessment of reasonable alternatives applies to removal from a custodial parent, and father was not the custodial parent. The statute that applies to a noncustodial parent, such as father, requires that the parent request custody. Father did not request custody at the dispositional hearing. Additionally, father does not show the evidence at the time of the dispositional hearing supported placing A.J. in his custody.

We affirm the juvenile court's jurisdictional and dispositional orders.

## BACKGROUND

A.J. was born in May 2021 and detained in August 2021. At the time the case started, A.J. lived with mother, who was 18 years old. In January 2022, the juvenile court found father to be A.J.'s presumed father. In February 2022, a paternity test showed that father was A.J.'s biological father.

### 1. *Petition*

Under section 300, subdivisions (a) and (b), DCFS alleged: A.J. "was medically examined and found to be suffering from a detrimental and endangering condition consisting of two healing posterior rib fractures. The injuries are consistent with inflicted trauma. Said injuries would not ordinarily occur except as the result of deliberate, unreasonable, and neglectful acts by the

3

child's parents who had care, custody and control of the child. Such deliberate, unreasonable and neglectful acts by the child's parents endangers the child's physical health and safety and place[s] the child at risk of serious physical harm, damage and danger." The juvenile court sustained the count under section 300, subdivision (a). Father does not dispute this basis for jurisdiction.

Under section 300, subdivisions (a) and (b), DCFS alleged: Mother and father "have a history of engaging in violent altercations in the child's presence. On 07/12/2021, while the mother was holding the child . . . in her arms the father forcibly attempted to remove the child from the mother's arms. The parents pulled the child back and forth in an effort to remove the child from one another's hold. During the violent interaction over the child, the child sustained a scratch to the child's eyelid. On prior occasions, the father[ ] struck the mother's face, choked the mother and struck the mother's legs and arms with the father's fist causing the mother to fall to the ground. The mother sustained a fractured neck and a fractured nose. Such violent conduct on the part of the father against the mother endangers the child's physical health and safety and places the child at risk of serious physical harm, damage, and danger." The court sustained this count under both subdivision (a) and subdivision (b)(1). Father does not challenge this ground for jurisdiction either.

DCFS alleged under section 300, subdivisions (b)(1) and (j): Father and "the father's former female companion [A.B.], mother to the child's half-sibling . . . have a history of domestic violence. On August 16, 2019, the father struck the female companion on the female companion's mouth with the father's hands and the

4

female companion struck the father with female companion's fists and a brick. The female companion was arrested for . . . [inflicting injury on a spouse or cohabitant]. On or about July 2020, the female companion threw a water bottle at [an unnamed person] . . . and attempted to run her over with the female companion's car. However, the father intervened and was struck by the female companion's car and sustained a fractured ankle. The child's [A.J.'s] half sibling is a current dependent of the Juvenile Court due to the violent conduct by the father and the father's former female companion. Such violent conduct by the father's female companion and the father endangers the child's [A.J.'s] physical health and safety and places the child at risk of serious physical harm, damage and danger." The court sustained these allegations only under subdivision (j). Father disputes that he was the father of A.J.'s alleged half sibling.

### 2. *Detention report*

In its detention report dated September 4, 2021, DCFS reported it had placed A.J. with H.W.

According to DCFS, the case commenced when an unidentified caller reported that father visited A.J. and was upset with mother because mother "engaged in sexual activities for money." The caller reported A.J. referred to "strange men" and " 'daddy' " when the men were not A.J.'s father. The caller stated father tried to take A.J. from mother and mother scratched A.J. on the face while trying to prevent father from taking him away. According to the caller, "[A]t some time during the incident, the father handed [A.J.] to the paternal grandfather. Once Law Enforcement arrived, the paternal grandfather gave [A.J.] back to the mother."

Another unidentified caller reported A.J. had two posterior rib fractures indicative of child abuse. A doctor later confirmed that the fractures typically occur "from a squeezing force on the rib cage" and the fractures appeared to have occurred in the middle of July 2021.

DCFS reported that mother lived with A.J, maternal great aunt, and two other children. Mother denied the allegation that she worked as a prostitute. Mother indicated father attempted to run off with A.J., and as mother tried to prevent father from taking A.J., mother and father "tussl[ed]" with A.J. During the "tussling," either mother or father scratched A.J. Mother reported that father was physically violent towards her on multiple occasions, including choking her and hitting her with his fist on her face, legs, and arms. According to mother, father fractured her nose and neck.

Mother signed a safety plan and indicated she would obtain a restraining order against father. Mother later told the social worker that she had obtained an emergency protective order. Mother acknowledged she was seeing a therapist for postpartum depression.

Maternal great aunt, with whom mother lived, took three days off work to supervise mother with A.J. Maternal great aunt indicated mother was a "good care provider" for A.J. Mother agreed to a safety plan with maternal great aunt or a therapist supervising mother with A.J. Maternal great aunt also agreed to the safety plan. (The record does not further indicate why the safety plan did not remain in place.)

When social workers interviewed father, father stated he "hear[d]" mother was "on the street with different men." Father indicated that on July 12, 2021, he confronted mother about

6

allowing A.J. to be "around different men" and took A.J. from mother. Father and mother "began tugging [A.J.] back and forth" until paternal grandfather took A.J. Father denied any domestic violence between him and mother. Father reported that he lived with paternal grandfather and paternal great grandmother and A.J. could live with them. There is no indication paternal grandfather and paternal great grandmother agreed that A.J. could live with them.

Father's criminal history dates back to 2013 and includes battery, burglary, assault with a weapon, receiving stolen property, and taking a vehicle without consent.

A police report attached to the detention report recited that on July 12, 2021, father told officers he had told mother "he was taking full custody of the child and would not allow the child to live" with mother. Mother told the officer that she may have accidentally scratched A.J. when she tried to take A.J. from father.

### 3. *Jurisdiction report*

In its jurisdiction report dated October 20, 2021, DCFS reported A.J. was still placed with H.W.

Mother reported father previously had abused her; he fractured her nose and neck and caused her to suffer two black eyes. Mother further reported father "sporadically" requested to see A.J. Mother said father told her that he had " 'altercations' " with his prior female companion. Mother wanted full custody of A.J. Mother started taking parenting classes when she learned she was pregnant. Mother was participating in weekly individual therapy since October 2020.

Father acknowledged the altercation with mother on July 12, 2021. According to father, he had asked paternal

7

grandfather " 'to take my kid.' " According to father, he initially thought he had a child with his prior companion, but a blood test revealed that the child was not his. DCFS indicated father did not dispute domestic violence between himself and A.B., his prior companion. DCFS also indicated that although it had attempted to locate a paternity test, it could not verify whether father was the biological father of A.B.'s child.

Father stated he wanted custody of A.J. He represented that he had a stable home and a neighbor could babysit A.J. when father was at work.

H.W., A.J.'s caretaker, reported that mother called every day and visited three times a week. According to H.W., father neither called nor visited A.J. Father stated he visited twice. DCFS provided mother with referrals.

DCFS reported, "Neither parent is being considered as a possible placement at this time as both parents created the situation that le[]d to the child sustaining fractured ribs."

On October 20, 2021, the court continued the jurisdictional/dispositional hearing and ordered DCFS provide father with low or no cost referrals for appropriate services. On October 27, 2021, a social worker sent father low or no cost referrals for parenting classes, domestic violence classes, anger management classes, and therapy. DCFS also provided father referrals to Miracles Counseling Center, Nurturing Parents, El Nido for Domestic Violence support groups, and Achieving Change Together.

4.    *Additional reports*

DCFS reported that in December 2021, A.J. was placed in foster care. Mother reported to a social worker that H.W. (A.J.'s caregiver) and her friends had gone to mother's residence to fight

8

mother. An unidentified person reported that a group of people, including H.W., "decided to give mother a 'beat down.'" Mother suffered a mild concussion, hematomas, and bruises.

## 5. *Jurisdictional/dispositional hearing*

No one testified at the April 14, 2022, jurisdictional/dispositional hearing. Regarding disposition, father's counsel argued, "I will submit on the proposed case plan. I spoke to my client. He indicates he's enrolled in a parenting class; so I ask that upon father presenting proof of that to the social worker, he be given credit for any progress he's made." Failing to recognize that the court previously had found that father was a presumed father, counsel requested that father be "named as presumed father today." The juvenile court also failed to recognize the prior identification of father as a presumed father. The court stated, "Technically, legally [father is] not a presumed father. He hasn't lived up to that level yet . . . . I don't have a legal ground to make him presumed."

The court declared A.J. a dependent under section 300, subdivisions (a), (b)(1), and (j). The court ordered A.J. placed in a suitable placement under DCFS's supervision.

## 6. *Subsequent events[2]*

On April 12, 2023, the juvenile court found the conditions justifying jurisdiction no longer existed. On April 19, 2023, mother regained custody of A.J. The juvenile court entered a final judgment indicating that father is A.J.'s presumed father.

---

[2] We grant respondent's unopposed motion to take judicial notice of the minute orders dated April 12, 2023 and April 19, 2023 as well as the final judgment.

The final judgment awarded mother full physical custody and mother and father joint legal custody. The final judgment indicated father's visits were to be supervised because father had not completed or made substantial progress in a domestic violence treatment program for offenders, parenting classes, or individual counseling.

## DISCUSSION

"Mootness in the dependency context—as in any context—depends on 'whether the appellate court can provide any effective relief if it finds reversible error.' [Citations.]" (*In re S.G.* (2021) 71 Cal.App.5th 654, 663.) "An appeal may become moot where subsequent events, including orders by the juvenile court, render it impossible for the reviewing court to grant effective relief." (*In re E.T.* (2013) 217 Cal.App.4th 426, 436.)

Father requests the following relief in this appeal: "The dispositional order removing A.J. from father's custody and from mother's custody must be reversed. Additionally, this Court should deem the minute order of the April 14, 2022 jurisdiction and disposition hearing to control over the reporter's transcript of the April 14, 2022 hearing—specifically with respect to the court's ruling that father is A.J.'s biological father but not his presumed father. Independently, the dispositional orders should be conditionally affirmed, and the matter should be remanded with direction the juvenile court order DCFS to conduct an initial ICWA inquiry of A.J.'s extended family members." With the exception of father's request to reverse the dispositional order, which lacks merit, father's arguments are moot.

## A. The Juvenile Court Has Recognized Father as a Presumed Father; the Error at the Dispositional Hearing In Denying Father Presumed Father Status is Thus Moot

It is undisputed that father is A.J.'s presumed father. The juvenile court erred at the dispositional hearing in referring to father as a biological father. The juvenile court corrected its error; the exit order specifies that father is a presumed father and father was awarded joint legal custody.

Father requests that this court acknowledge that the minute order from the dispositional hearing controls over the reporter's transcript. This relief would not assist father because the minute order does not identify father as a presumed father, and more important, the juvenile court has already found father is a presumed father. Father's argument that the juvenile court erred in referring to him at the dispositional hearing as a biological father is moot because this court can provide father no effective relief. (*In re E.T.*, *supra*, 217 Cal.App.4th at p. 436.)

## B. We Decline To Exercise Discretion To Consider Father's Argument That the Section 300, Subdivision (j) Count Is Not Supported By Substantial Evidence

Father argues we should reverse the count sustained under section 300, subdivision (j) because it is not supported by substantial evidence where father was not A.B.'s child's father and the court struck the same allegations made under section 300, subdivision (b)(1). Father "acknowledges" that jurisdiction is appropriate under other counts but argues this

11

court should exercise its "inherent discretion" to consider his challenge. We decline to do so.

"Pursuant to the doctrine of justiciability, ' " '[a] judicial tribunal ordinarily may consider and determine only an existing controversy, and not a moot question or abstract proposition.' " ' [Citation.] Application of the doctrine of justiciability in the dependency context leads to the conclusion that '[w]hen a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.] This is true because no effective relief could be granted in such a situation, as jurisdiction would be established regardless of the appellate court's conclusions with respect to any such additional jurisdictional grounds." (*In re Madison S.* (2017) 15 Cal.App.5th 308, 328–329.)

We decline to exercise our inherent discretion to consider father's challenge. (*In re D.P.* (2023) 14 Cal.5th 266, 282 [court has inherent discretion to consider an issue even if technically moot].) Father's challenge to parentage is not based on "particularly pernicious or stigmatizing conduct" and is not likely to prejudice father in the current or future dependency cases given the other jurisdictional bases unchallenged by father. (*Id.* at pp. 285–286.)

12

**C.    Subsequent Events Have Mooted Father's Argument That the Juvenile Court Erred In Removing A.J. From Mother's and Father's Custody**

First, father requests we reverse the dispositional order. According to father, no substantial evidence supported the finding that DCFS made reasonable efforts to avoid removal and that there were no reasonable alternatives to removal.  Father's argument is unpersuasive.

First, father's argument is moot as to mother because the juvenile court has since returned A.J. to mother's custody.  If this court were to reverse the dispositional order and remand to the juvenile court for a new dispositional hearing, the court would be required to leave A.J. in mother's custody.  She was the custodial parent at the time the dependency proceedings commenced and "a court cannot award custody to a noncustodial parent [here father] without first removing the child from the custodial parent." (*In re Miguel C.*  (2011) 198 Cal.App.4th 965, 970.)  Father identifies no relief this court could provide him at a new dispositional hearing.

Second, father's argument that DCFS failed to show there were no reasonable alternatives to removal is based on a statute applicable to the custodial parent.  Father, however, was not the custodial parent at the time the dependency proceedings commenced.  We acknowledge that before removing a child from the physical custody of a parent "with whom the child resides at the time the petition was initiated," the juvenile court shall find "there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).)  That

13

statute does not apply to a noncustodial parent like father. (*In re Anthony Q.* (2016) 5 Cal.App.5th 336, 347, 350.)

The statute applicable to father as a noncustodial parent is section 361.2, which allows a juvenile court to place a child with a noncustodial parent who "requests custody" unless "placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).) Here father never requested custody of A.J. at the dispositional hearing. DCFS recommended against placing A.J. with father and as noted above, father's counsel stated, "I will submit on the proposed case plan. I spoke to my client. He indicates he's enrolled in a parenting class; so I ask that upon father presenting proof of that to the social worker, he be given credit for any progress he's made." Because father did not request custody at the dispositional hearing, the juvenile court did not err in not placing A.J. in his care.

Finally, father identifies no evidence countering that placing A.J. with father would have been detrimental to A.J. The evidence demonstrated that father had a long history of abusing mother. It also supported that he contributed to fracturing A.J.'s ribs. No evidence supported the inference that father developed insight into his abusive conduct. There was no evidence that father had followed through with any of the referrals DCFS provided. His counsel's statement that father had started a parenting class does not support the inference that A.J. would not have been at risk if placed in father's care.

Father's argument that the court should have considered placing A.J. in father's custody "on the condition that the paternal great-grandmother and the paternal grandfather remain in the home" is unpersuasive because (1) father did not

14

request that placement in the juvenile court and father identifies no evidence that paternal great grandmother and paternal grandfather agreed to such a plan; and (2) father identifies no evidence that paternal great grandmother and paternal grandfather could have ensured A.J.'s safety, especially given that paternal grandfather had participated in father's efforts forcibly to remove A.J. from mother's care.

**D.     Father's Argument That Social Workers Should Have Interviewed Extended Family Members About A.J.'s Potential Indian Ancestry Is Moot**

Father requests we "conditionally affirm" and remand to the juvenile court for inquiry of extended family members as to whether A.J. is an Indian child.

The record does not show that social workers interviewed either mother's or father's extended family members. Assuming arguendo that under section 224.2, subdivision (b), DCFS should have asked extended family members about whether A.J. was an Indian child, any such error would be moot because the juvenile court returned A.J. to mother's custody.  (See *In re Austin J.* (2020) 47 Cal.App.5th 870, 881, fn. 5 [where child returned to the parents' custody, question of noncompliance under The Indian Child Welfare Act of 1978 was moot], superseded on another point by amended section 224 (Assem. Bill No. 2944 (2019–2020 Reg. Sess.).)  We decline to exercise our inherent discretion to consider father's challenge.  (*In re D.P.*, *supra*, 14 Cal.5th at p. 282.)

15

## DISPOSITION

The juvenile court's jurisdictional and dispositional orders are affirmed.

NOT TO BE PUBLISHED.

BENDIX, J.

We concur:

ROTHSCHILD, P. J.

WEINGART, J.